## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CLIFTON M. THOMAS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 10-78-GMS-SRF |
| | ) |
| CAROLYN W. COLVIN,[1] | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

## I. INTRODUCTION

Plaintiff, Clifton M. Thomas ("Thomas" or "plaintiff") appeals from a decision of

Carolyn W. Colvin, the Commissioner of the Social Security Administration ("Commissioner"

or "defendant"), denying his claims for disability insurance benefits ("DIB"). This court has

jurisdiction pursuant to 42 U.S.C. § 405(g).

Presently before the court are cross-motions for summary judgment filed by Thomas and

the Commissioner. (D.I. 16, 20) Thomas asks the court to reverse the Commissioner's decision

and remand with instruction to award benefits, or in the alternative reverse and remand for

further proceedings in accordance with applicable law and regulations. (D.I. 16) For the

following reasons, I recommend that the court grant-in-part Thomas' motion for summary

judgment, deny the Commissioner's motion for summary judgment, and remand the matter for

further administrative proceedings.

[1] Carolyn W. Colvin became the Commissioner of the Social Security on February 13, 2013, after this proceeding was initially filed. Pursuant to Fed. R. Civ. P. 25(d), Carolyn W. Colvin replaced the previous Commissioner, Michael J. Astrue, as the defendant in this case.

1

## II. BACKGROUND

### A. Procedural History

Thomas filed claims for DIB on February 7, 2005, alleging disability since June 30, 2004. (*Id.* at 7) On June 23, 2005, the Social Security Administration denied his DIB benefits claim. (D.I. 11 at 53) Thomas requested a hearing before Administrative Law Judge ("ALJ"), and a video hearing was held on October 24, 2007. (*Id.* at 20) On October 27, 2007, Thomas amended his application for benefits to reflect a disability onset date of June 3, 2006. [2] (*Id.* at 475) Thomas requested a supplemental hearing, which was conducted on October 9, 2008 by video hearing. (*Id.* at 20) Thomas was represented by counsel, and a vocational expert ("VE") testified at both hearings. (*Id.*)

On November 5, 2008, the ALJ issued a decision finding that Thomas was not disabled and could perform a limited range of light work available in the national economy. (*Id.* at 24-25, 29) The Appeals Council denied Thomas's request for review on September 5, 2009. (*Id.* at 12) On January 29, 2010, Thomas filed the present action for review of the final decision. (D.I. 2)

### B. Factual Background

#### i. Medical History

##### 1. Knees

Thomas underwent multiple procedures on his knees between 1994 and 2003. On January 13, 2003, Alex Bodenstab, M.D., performed partial knee replacements on both of Thomas's knees. (D.I. 11 at 136-37) Four months after Thomas's surgery, he reported to Dr. Bodenstab that both of his knees were bothering him, but principally the left knee. (*Id.* at 189) Dr. Bodenstab noted that Thomas had full knee extension and could flex them to about 125 degrees or more, but

---

[2] The ALJ's decision incorrectly states the claimant amended his onset date to December 3, 2004. (D.I. 11 at 20)

indicated that there was a small effusion present in each knee. (*Id.*)

Thomas was treated for his knee discomfort by Conrad K. King, Jr., M.D., a physical medicine and rehabilitation specialist, from June 4, 2003 to January 23, 2006. (*Id.* at 238-71, 355-70) An examination of Thomas's knees, on June 4, 2003, revealed well-healed surgical scars, eighty to eighty-five percent bilateral range of motion, bilateral tenderness with residual swelling, and no erythema. (*Id.* at 270) Dr. King diagnosed internal derangement of both knees with chronic synovitis despite extensive conservative treatment and surgical intervention, and prescribed Oxycontin. (*Id.* at 270-71) Thomas reported severe pain and difficulty walking at each subsequent visit. (*Id.* at 238, 240, 242-43, 265, 268) However, he also indicated that he was able to perform activities of daily living when taking his medications. (*Id.* at 245, 249, 251, 255-56, 261, 267)

From August 2004 to March 30, 2005, Dr. King certified that Thomas was totally incapacitated for work. (*Id.* at 244-54) On March 30, 2005 to August 17, 2005, Dr. King released Thomas to sedentary work with no standing and walking except to get to and from work, breaks, or lunch. (*Id.* at 240-41, 362, 364, 365, 366) In a Residual Functional Capacity Questionnaire on September 19, 2005, Dr. King diagnosed internal derangement of the right knee, degenerative joint disease of both knees and degenerative disc disease of the lumbar spine. (*Id.* at 280) Dr. King opined that Thomas would constantly have pain severe enough to interfere with his attention and concentration needed to do unskilled work. (*Id.* at 280-81) He was limited to walking a half a block at one time; sitting for four hours and standing and walking less than two hours; and Thomas would need unscheduled breaks three to five times a day lasting about fifteen to twenty minutes. (*Id.* at 282) Dr. King stated Thomas could lift less than ten pounds frequently, ten pounds occasionally, and twenty pounds rarely. (*Id.*) He would have good and bad days and

3

would be absent more than four days per month due to treatment and health problems. (*Id.* at 283)

Dr. Anne Aldridge, a state agency medical consultant, reviewed Thomas's medical records on June 17, 2005. (*Id.* at 272-79) Dr. Aldridge found that Thomas could lift twenty pounds occasionally, ten pounds frequently, stand or walk for a total of at least two hours in an eight-hour workday, and sit for a total of about six hours in an eight hour workday. (*Id.* at 273) Despite these findings, Dr. Aldridge provided her opinion that Thomas' "RFC is for Sedentary, consistent with TSO in this partially credible claimant." (*Id.* at 274)

Multiple physicians from Singson Medical Group treated Thomas seven times between December 2004 and October 2005. (*Id.* at 285-306) Thomas complained of knee pain of seven on a scale of ten during these office visits, and was prescribed Percocet for the pain. (*Id.* at 285, 291, 292, 295, 298, 301, 304)

In October 2005, Thomas reported ongoing right knee pain to Dr. King. (*Id.* at 359) Upon examination, Dr. King found that Thomas had full range of motion in the right knee; discomfort on extremes of flexion; weakness on resisted flexion and extension; and peripatellar tenderness and swelling. (*Id.* at 357, 359) In December 2005, Thomas reported that he had persistent pain in his right knee, and that bending motions, sitting, standing, and stair-climbing exacerbated his pain. (*Id.* at 356) In January 2006, Dr. King referred Thomas to Ganesh R. Balu, M.D., for chronic pain management. (*Id.* at 355)

Dr. Balu treated Thomas for right knee pain from February 2006 to December 2007. (*Id.* at 371-91, 434-36) He diagnosed post-traumatic arthritis of the right knee, prescribed Oxycontin and Percocet, and noted that Thomas was receiving conservative care. (*Id.* at 371-91, 434-36) Examinations showed knee joint line tenderness, crepitus, a mildly antalgic gait, decreased range

4

of motion, and minimal swelling. (*Id.* at 371-91, 434-36) Dr. Balu noted that Thomas was using a cane for ambulation, but also indicated that there was no significant change in his knee condition in November 2006. (*Id.* at 380) In February 2007, Dr. Balu suggested Thomas may need a total knee replacement. (*Id.* at 377)

From November 2005 to July 2008, Jeffrey Kerner, D.O., was Thomas's primary care physician, and his treatment records show that Thomas consistently complained of knee pain. (*Id.* at 397-420, 438-68) In December 2007, Dr. Kerner noted palpable cracking and swelling of the knees. (*Id.* at 456) In January 2008, Dr. Kerner discussed a possible total knee replacement and noted Thomas's knees were cracking and had minimal swelling. (*Id.* at 451-52)

Dr. Kerner completed a Residual Functional Capacity Questionnaire August 12, 2008 and diagnosed Thomas with degenerative arthritis of both knees, hypertension, generalized anxiety, and low back pain. (*Id.* at 438) Dr. Kerner opined that Thomas would frequently experience pain or other symptoms severe enough to interfere with attention and concentration needed to perform even simple work tasks; was limited to sitting, standing, or walking less than two hours in an eight hour work day; would need unscheduled breaks every two to three hours; and was limited to lifting ten pounds occasionally, twenty pounds rarely, and fifty pounds never. (*Id.* at 439-40) Thomas would have good and bad days and on average miss more than four days per month due to the impairments. (*Id.* at 441)

During a consultative physical evaluation by Yong K. Kim, M.D., on February 6, 2008, Plaintiff had reduced flexion and extension in both knees; mild tenderness in the knees without swelling; normal knee stability; normal motor strength in the lower extremities; and no muscle atrophy. (*Id.* at 422-23) He had an antalgic gait that favored the left lower extremity; was able to stand and walk on his toes and heels with difficulties due to increasing pain in his low back and

5

knees; and was able to walk without an assistive device. (*Id.* at 421-23)

In Dr. Kim's Medical Source Statement, he opined that Thomas could lift eleven to twenty pounds occasionally, and up to ten pounds frequently, lift and/or carry ten pounds frequently, sit for five hours total, stand for two hours total, and walk for three hours total in an eight-hour day; sit for thirty minutes, stand for twenty minutes, and walk for twenty minutes at a time without interruption. (*Id.* at 428- 29)

## 2. Depression

Depression treatment records from Singson Medical Group, in 2005, show that Thomas was prescribed Xanax for anxiety. (*Id.* at 291, 294, 296-97, 299-300, 303)

On April 26, 2006, Frederick Kurz, Ph.D., performed a consultative psychological evaluation. (*Id.* at 328) Thomas told Dr. Kurz that he had depression and anxiety. (*Id.*) On mental status examination, Thomas was appropriately dressed, fully oriented, courteous, and cooperative; maintained normal eye contact; was able to follow directions and answer questions; had a flat affect; spoke in sentences that were relevant, goal-directed, intelligible, and coherent; and did not exhibit any signs of thought processing disorders, hyperactivity, distractibility, impulsivity, delusions, or hallucinations. (*Id.* at 329) Testing established that Thomas read at a high school level. (*Id.* at 330) Dr. Kurz noted that Thomas appeared to function within the average range of intelligence and displayed only mild indications of depression. (*Id.*) Dr. Kurz assigned Thomas a global assessment of functioning ("GAF")[3] score of 60. (*Id.*)

---

[3] The GAF score, on a scale of 1-100, allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, to assess the person's mental health illness. *See* Am. Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders 4d*, (2000). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. *Id.* A GAF of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. *Id.* A GAF of 61 to 70 is

On May 4, 2006, Patricia Lifrak, M.D., performed an initial psychiatric consultation. (*Id.* at 394-96) Thomas stated that he was feeling depressed. (*Id.* at 394) Dr. Lifrak diagnosed major depression; prescribed medication; and assigned Thomas a GAF score of 55 to 60. (*Id.* at 396) In July 2006, Thomas stated he was less depressed and that he felt "a lot better." (*Id.* at 393) During his third, and final, visit with Dr. Lifrak on October 3, 2007, Thomas stated that he felt more depressed over "life activities" and that he wanted to "get SSI." (*Id.* at 392)

On June 8, 2006, Hillel Raclaw, Ph.D., a state agency psychological consultant, reviewed the evidence in the record and determined that Thomas had an affective disorder that caused mild limitations and was non-severe. (*Id.* at 343)

In 2007, Thomas consistently complained of depression to Dr. Kerner, and was prescribed Xanax for his symptoms. (*Id.* at 397-401, 403-04, 411, 455, 457) In August 2007, Thomas expressed that his depression was worsening and that he was isolating himself and not sleeping well. (*Id.* at 400), In July 2008, Thomas told Dr. Kerner that he had a good energy level and "felt well emotionally." (*Id.* at 444)

### 3. Obesity

Thomas is five feet seven inches tall. (*Id.* at 286) He weighed 241 pounds in October 2004; 236 pounds in January 2005; 236 pounds in May 2005; 240 pounds in October 2005; 240 pounds in October 2007; and 232 pounds in February 2008. (*Id.* at 286, 290, 302, 311, 422, 483) On each of these dates, Thomas's body mass index (BMI) exceeded 30.0. The state agency medical consultant, Dr. Aldridge, noted that Thomas was moderately obese with a BMI of 35.2. (*Id.* at 273)

---

assigned to an individual who has some mild symptoms or some difficulty in social, occupational, or school functioning. *Id.*

### 4.    Blood Pressure

Thomas has a history of hypertension, but it is controlled (*Id.* at 289, 293, 295, 298, 305, 411, 422, 448, 451-52)

### 5.    Lumbar Spine

Thomas injured his lower back on December 1, 2003, when he fell on an escalator. (*Id.* at 370-71) On examination by Dr. King on December 3, 2003, Thomas had a seventy-five to eighty percent normal lumbar range of motion; full range of motion on lateral bending with complaints of pain; moderate erector spinae muscle spasms; and negative straight leg raising at seventy-five degrees bilaterally. (*Id.* at 370) He was diagnosed with acute lumbar strain and sprain. (*Id.*)

On January 14, 2004, Thomas complained of worsening low back symptoms to Dr. King. (*Id.* at 368) Dr. King noted that he would refer Thomas to physical therapy. (*Id.*) Dr. Kim in his consultative physical examination noted decreased lumbar forward flexion; normal lumbar lateral flexion; negative straight raising on the right; complaints of pain at seventy-five degrees with straight leg raising on the left; no muscle atrophy; and normal muscle strength. (*Id.* at 422-23, 425)

### 6.    Hearing Loss

On March 27, 2006, Thomas told Dr. Kerner that he was unable to hear out of his right ear, but was not experiencing other symptoms such pain or dizziness. (*Id.* at 414-15) Dr. Kerner referred Thomas to a specialist; however, the record does not show any subsequent evaluation by a hearing specialist. (*Id.* at 415) On February 6, 2008, Dr. Kim noted that Thomas had no hearing deficits. (*Id.* at 422)

### ii.  Administrative Hearings

Thomas's administrative hearing took place on October 24, 2007. (*Id.* at 478-509) A supplemental hearing took place on October 9, 2008. (*Id.* at 510-526) Thomas testified and was represented by counsel at both proceedings. (*Id.* at 480-504, 512-518) A vocational expert also testified at both proceedings. (*Id.* at 504-08, 519-25)

### 1.  Thomas's Testimony

At the hearing on October 24, 2007, Thomas testified that he was five feet seven inches tall, and weighed approximately 240 pounds. (*Id.* at 483) He stated that he has a driver's license, but is only able to drive when unmedicated due to side effects from medications. (*Id.* at 484, 501) He stated that he has an eleventh grade education and is able to read, write, and do simple math. (*Id.* At 484) He worked for NVF Corporate Company from 1988 to 2004 as an operator and plant group leader that had limited supervisory responsibility, and was not permitted to discipline, hire, and fire employees. (*Id.* at 485-86, 502) Thomas stated that he was forced to accept a layoff because he was frequently absent due to his medical condition. (*Id.* at 486-87)

Thomas claimed that he was unable to work due to problems with his knees, low back and hips, and noted that he has significant pain in these areas that radiate to his ankles. (*Id.* at 487) Thomas stated that he has back pain most of the time and that Dr. Kerner provided care for his back by prescribing medications, pain patches and Icy Hot. (*Id.* at 488) On a scale of one to ten, his pain averaged at a five with medications and a seven without medications. *Id.* Thomas reported that treatment provided little improvement in pain. (*Id.*) Thomas also reported constant pain in his hips that averaged about a five to six on a pain scale from one to ten and about a seven without medications. (*Id.* at 489-490)

Thomas stated that Dr. Kerner and Dr. Balu provided treatment for his knees and

prescribed Percocet 10 mgs for his knee pain. (*Id.* at 490) He noted that he has constant pain, swelling and decreased range of motion. (*Id.* at 490-491) Thomas reported that he is limited to walking a block to a block and a half and that the longest he would be able to walk is approximately four to five minutes. (*Id.* at 491) His bilateral knee pain, on a scale from one to ten, ranges between a five-with medications-and a seven-without medications. (*Id.*)

Thomas reported that he takes Ambien, but is still unable to sleep. (*Id.*) On an average night, he reported that he sleeps about three to four hours. (*Id.* at 492) Thomas also discussed his asthma, noting that he uses a nebulizer about two to three times per day. (*Id.*) He admitted to smoking about a pack of cigarettes per day. (*Id.* at 492-93)

Thomas stated that he can stand approximately ten to fifteen minutes at a time, and sit for only minutes. (*Id.* at 493) He stated that he is able to lift no more than ten pounds. (*Id.*) He stated that he is not able to go up and down stairs from a first to a second floor. (*Id.*) He is unable to stoop and bend at the waist. (*Id.* at 503)

Thomas indicated that he has depression and suicidal thoughts, but is prescribed Lexapro and Effexor. (*Id.* at 494) He noted on the average day that he feels depressed and sad. (*Id.*) He stated that he had the following symptoms and experiences: desire to be away from people; decreased socialization; thoughts of harming himself; past attempt to harm himself; problems with memory and concentration; problems with appetite; anger and irritability; physical and verbal fights; paranoid thoughts; mood swings; racing thoughts; auditory hallucinations; anxiety and panic attacks. (*Id.* at 495-497)

Thomas testified that he was not happy with Dr. Lifrak and would be changing psychiatrists. (*Id.* at 498) At the supplemental hearing in October 2008, Thomas testified that he had not yet found another psychiatrist and was not seeing anyone for mental health counseling or

10

therapy. (*Id.* at 517)

Thomas reported some difficulty with caring for himself, maintaining personal hygiene, and performing household chores. (*Id.* at 499) Thomas's sister performs the cooking, grocery shopping, and laundry chores. (*Id.* at 499-500.) He stated that he has difficulty with keeping track of his money and paying bills and requires the assistance of his sister. (*Id.*) He stated that he generally sits and watches TV or lies in bed during the day. (*Id.* at 500-501) Thomas reported that he has approximately two good days out of ten, and on a bad day, he may experience crying, pain, and negative thoughts. (*Id.* at 503)

At the supplemental hearing on October 9, 2008, Thomas reported that his knees were becoming worse, that he was experiencing decreased mobility, and that his physician recommended an evaluation for a total knee replacement. (*Id.* at 514-15) He stated that Dr. Kerner referred him to Dr. Bodenstab, an orthopedic surgeon, for an evaluation. (*Id.*) Thomas reported that he was experiencing increased difficulty sleeping and that he continued to take pain medication such as Oxycodone 30 mgs., six times per day, Percocet 10 mgs. for breakthrough pain, Xanax for anxiety, Lexapro for depression and other medications he could not recall. (*Id.* at 515) Thomas reported increased difficulty walking and required the use of a cane. (*Id.* at 516)

## 2. Vocational Expert's Testimony

Vocational expert, Jan Howard-Reed, testified at Thomas's hearing. (*Id.* at 504) She stated that Thomas's past relevant work was heavy and semi-skilled, but there were no transferrable skills. (*Id.* at 504-05) The ALJ posed the following hypothetical to the VE:

> If we consider a hypothetical person who is about the claimant's stated age at onset . . . 49 years [old]. This person has an eleventh grade education and the work history that you just talked about. There are certain underlying impairments that place limitations on the ability to do work-related activities. In this particular hypothetical, this is a person who would be limited to a light level of exertion. If we can, jobs that would be several at light, several at sedentary if you can. The

11

person would need simple, unskilled work due to medication side effects and depressive symptoms. Posturally, should never crawl, kneel or climb a ladder, rope or a scaffold. The rest of the postural are occasional. This person should avoid concentrated exposure to temperature extremes, hazards, and all fumes, odors, dusts, gasses, or poor ventilation... Would there be any simple, unskilled work, maybe several at light and several at sedentary, that such a person could do, in your opinion?

(*Id.* at 504)

Based upon the ALJ's hypothetical listing out restrictions, the VE stated that Thomas would not be able to perform his past relevant work, but could work as a cashier, packer, sedentary security guard, inspector, order clerk and assembler. (*Id.* at 505-06) The ALJ asked the VE if there would be any impact on Thomas's ability to work the jobs she cited with the additional limitations imposed in Dr. King's assessment. (*Id.* at 506) The VE responded that work would be precluded. (*Id.*)

During examination by Thomas's counsel, the VE stated that if an employee misses more than an hour per day of work then work would be precluded. (*Id.* at 507) The VE agreed that if an employee was going to take three to five breaks a day lasting between fifteen to twenty minutes then work would be precluded. (*Id.* at 507) Additionally, the VE stated that an employer would not tolerate an individual being absent more than four days per month. (*Id.* at 507) The VE stated that the packer, inspector, and cashier positions require standing most of the time, but could be performed with the use of a stool to accommodate sitting. (*Id.* at 507-08)

A vocational expert also testified at Thomas's supplemental hearing. (*Id.* at 519) The ALJ posed the following hypothetical to the VE:

The individual is 50 years of age at the amended onset date, has an eleventh grade education, and the work history that we just mentioned. At the prior hearing I have a light hypothetical with postural, all occasional. However, there should be no climbing of ladder, rope or scaffold or kneeling or crawling. The rest of the postural are occasional. Avoid concentrated exposure to temperature extremes, hazards, fumes, odors, poor ventilation. I would add today that there would be

12

avoid concentrated exposure to noise. Additionally, there would be a need for
simple, unskilled work...Now, I would ask you to consider ... Dr. Kim['s]
[RFC]...Would the addition of those limitations have [any impact] on the jobs
that you've indicated at the prior hearing?

(*Id.* at 520-21)

The VE indicated that, even after considering Dr. Kim's Medical Source Statement, the
hypothetical individual would still be able to perform light unskilled work, such as cashier,
packer, and inspector. (*Id.* at 521) Subsequently, Thomas's attorney requested that the VE look at
Dr. Kerner's RFC, and the VE testified that the additional limitations imposed by it would
eliminate work. (*Id.* at 521-22)

During examination by counsel, the VE stated that pursuant to Dr. Kim's opinion,
Thomas could sit five hours per day and stand about two to three hours in an eight hour workday,
and that these limitations indicated a range between sedentary and light. (*Id.* at 523) The VE
further stated that Dr. Kim's RFC is not strictly a light RFC. (*Id.* at 523-24) The VE further
opined that the standing requirement for light work is typically six hours a day. (*Id.* at 524)

### iii. The ALJ's Findings

Based on the factual evidence and the testimony of Thomas and the VE, the ALJ
determined that Thomas has not been under a disability within the meaning of the Act from June
30, 2004 through the date of his decision. (*Id.* at 30) The ALJ's found, in pertinent part:

1. The claimant meets the insured status requirements of the Social Security Act
   through December 31, 2009.

2. The claimant has not engaged in substantial gainful activity since June 30,
   2004, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: mild asthma, obesity, and
   bilateral knee pain (20 CFR 404.1521 *et seq.*).

4. The claimant does not have an impairment or combination of impairments that
   meets or medically equals one of the listed impairments in 20 CFR Part 404,
   Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

13

5. ... [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that all postural are occasional with no climbing a ladder, rope, or scaffold, and the claimant should avoid concentrated exposure to exposure to temperature extremes, wetness, humidity, vibration, hazards, fumes, odors, dusts, gasses, and poor ventilation. A sit/stand option is required. Due to medication side effects, he is limited to simple, unskilled work.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on December 3, 1956 and was 48 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical- Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

(*Id.* at 22-29)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive if they are supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. *See id.* at 1190-91.

14

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In the context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion." *Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of the plaintiff's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the [Commissioner]'s decision with or without remand to the [Commissioner] for rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## III. DISCUSSION

### A. Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). As defined by the Act, "disability" is the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. *See* 42 U.S.C. § 423(d)(1)(A). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F .R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. §§ 404.1520(a)(4). At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i) (mandating finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii) (mandating finding of non-disability when claimant's

impairments are not severe). If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. §§ 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the RFC to perform his past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Halter*, 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to his past relevant work." *Plummer*, 186 F.3d at 428.

If the claimant is unable to return to his past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude him from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must

17

analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

### B. Thomas's Arguments on Appeal

Thomas contends that the ALJ erred by according less weight to the opinions of Drs. King, Kerner, and Balu, which are supported by objective findings, and reflect expert judgments based on continued observation of Thomas's condition over a prolonged period of time. (D.I. 16 at 27-29) Thomas further contends that the ALJ failed to provide rationale for rejecting the portion of Dr. Aldridge's opinion limiting Thomas to sedentary activity. (*Id.* at 20) Similarly, Thomas asserts that the ALJ failed to provide a rationale for rejecting Dr. Kim's opinion in his Medical Source Statement, which imposes stricter limitations on Thomas's capacity for standing and walking than those set forth in the ALJ's RFC assessment. (*Id.* at 21) Moreover, Thomas asserts the ALJ failed to address a written witness statement of Dr. Fox, and a report conducted on Thomas by Dr. Stephen Rodgers. For these reasons, Thomas asserts that the ALJ's determination that Thomas had the residual functional capacity to perform light unskilled work is not based upon substantial evidence.

### C. Analysis

#### i. The ALJ's assignment of weight to medical expert testimony

A treating source's medical opinion will be given "controlling weight" if an ALJ finds: (1) the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques; and (2) the opinion is not inconsistent with the other substantial evidence in the record. *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001); 20 C.F.R. § 404.1527(d)(2); Social Security Regulation ("SSR") 96–2p. In many cases, even if a treating source's medical opinion does not meet the test for controlling weight, it will nevertheless be entitled to great

weight and should be adopted by an ALJ. *Fargnoli*, 247 F.3d at 43. In order to determine what weight to accord a non–controlling treating physician opinion, an ALJ is required to weigh the evidence in light of several factors. *Id.* These factors include: (1) the examining relationship—more weight is given to the opinion of a source that has examined a plaintiff as compared to a source that has not; (2) the length, nature and extent of the treatment relationship—more weight is given to the opinion of treating sources since these professionals are most able to provide a detailed and longitudinal picture of a plaintiff's medical history; (3) the supportability of the opinion—more weight is given the opinions that are well explained and supported with clinical or diagnostic findings; (4) the consistency of the opinion—more weight is given to opinions that are more consistent with the record as a whole; (5) specialization—opinions of specialists are given more weight; and (6) other factors which tend to support or contradict an opinion. 20 C.F.R. § 404.1527(d). Regardless of the weight accorded, an ALJ's determination must always provide "good reasons" for the weight given to a treating source's opinion, *id.*, and an ALJ can only "reject a treating physician's opinion if it is based on 'contradictory medical evidence.' " *Dougherty v. Astrue*, 715 F.Supp.2d 572, 581 (D. Del. 2010) (citing *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)).

Pursuant to Social Security Ruling 96-6P, findings regarding the nature and severity of an impairment made by State agency consultants and other program physicians "must be treated as expert opinion evidence of non-examining sources[,]" and an Administrative Law Judge "may not ignore these opinions and must explain the weight given to these opinions in their decisions." When there is conflicting probative evidence, there is a need for an explanation of the reasoning behind the ALJ's conclusions. *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981); *see also Brown v. Astrue*, 590 F. Supp. 2d 669, 675-76 (D. Del. 2008) (remanding a case where the ALJ

accepted the opinions of certain state agency physicians but failed to discuss the opinions of other state agency consultants that were more restrictive).

The ALJ was permitted to assign less weight to the assessments by treating physicians Dr. King, Dr. Kerner, and Dr. Balu. Neither Dr. King's nor Dr. Kerner's treatment notes mention the specific limitations Thomas mentioned, *i.e.*, having two good days out of ten days, staying in bed three to four days in a row, or remaining in his room up to a week at a time. Similarly, Dr. Kerner's and Dr. Balu's treatment notes do not mention Thomas falling six to seven times, as he claimed.

The ALJ's decision to assign less weight to the treating physician opinions is supported by substantial evidence because the ALJ explained that Dr. King, Dr. Kerner, and Dr. Balu did not refer to any objective testing in their assessments, and there is no evidence in the record that supports such restrictive limitations. (*Id.* at 28) In Dr. King's RFC, he merely noted that the clinical findings and objective signs for his opinion were that Thomas had a knee replacement and had chronic swelling of right knee. (*Id.* at 280) Similarly, Dr. Kerner noted the clinical findings and objective signs were Thomas's knee replacement and that x-rays revealed anatomical changes in Thomas's lumbar spine. (*Id.* at 438) Dr. Kerner did not treat Thomas for knee pain, and his physical examination notes are sparse with respect to the limitations he placed on Thomas. While Dr. Kerner's treatment records confirm that Thomas reported knee pain, they also are largely deficient in clinical or laboratory findings related to Thomas's knees. (*Id.* 397-420, 443-59) The ALJ also noted that Dr. Balu, who treated Thomas for over a year, inconsistently indicated in various treatment notes that Thomas was able to work "full time" at a "light" level of exertion, "off work," "disabled," "regular," or "modified" work. (*Id.* at 27, 371-82)

20

However, the ALJ's assessment of the State agency consultant opinions of Dr. Kim and Dr. Aldridge is not supported by substantial evidence. The ALJ concluded that the opinions of Dr. Kim and Dr. Aldridge were consistent with the ability to perform light work. (*Id.* at 28) Light work is defined under SSR 83-10 as involving "a good deal of walking or standing – the primary difference between sedentary and most light jobs," and "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday."

Dr. Kim reported that Thomas was able to stand and walk on his toes and heels with difficulty due to increasing pain in his low back and knees. (Tr. at 421-23) Dr. Kim noted that Thomas' standing was limited to twenty minutes at a time, and sitting was limited to thirty minutes at a time, due to pain in his knees and low back. (*Id.* at 429) Dr. Kim's report contains conflicting findings regarding the total amount of time Thomas can sit or stand during an eight-hour day. Specifically, Dr. Kim opined in his medical evaluation report that Thomas could sit for a total of four to six hours in an eight-hour day, and stand and walk for a total of four to six hours in an eight-hour day, but noted on the subsequent checklist that Thomas could sit for no more than five hours and stand for no more than two hours total in an eight-hour day. (*Id.* at 423, 429) The ALJ did not mention this discrepancy in Dr. Kim's findings, and instead concluded that Dr. Kim's opinion supported a finding that Thomas "could generally stand and walk four to six hours during an eight our [sic] day and sit four to six hours during the same period." (*Id.* at 27) Dr. Kim's conclusion that Thomas cannot stand or walk for more than two to three hours in an eight-hour workday does not support the ALJ's conclusion that Thomas is capable of performing light work.

The ALJ also afforded greater weight to the assessment of Dr. Aldridge, concluding that

21

the assessment supported an RFC capacity for light work. (*Id.* at 28) However, the ALJ did not acknowledge that Dr. Aldridge's findings place Thomas between sedentary and light levels of exertion. Specifically, Dr. Aldridge's findings support a sedentary RFC because she opined that Thomas was limited to no more than two hours of standing or walking in an eight-hour day, and her findings support a light RFC with respect to her determination that Thomas could frequently lift or carry ten pounds and occasionally lift or carry twenty pounds. (*Id.* at 273) The internal conflict that stands out in Dr. Aldridge's report is her statement limiting Thomas to sedentary work, "RFC is for Sedentary, consistent with TSO in this partially credible claimant." (*Id.* at 274) No mention of this opinion is acknowledged or explained by the ALJ. Absent an explanation by the ALJ of how these discrepancies in the State agency consultants' opinions factored into the conclusion that Thomas is capable of performing light work, this court cannot conclude that the ALJ's findings are supported by substantial evidence.

### ii. The ALJ's credibility determination of Thomas

When assessing a claimant's RFC, an ALJ is obligated to evaluate a claimant's subjective symptoms, including pain. 20 C.F.R. § 404.1529(d)(4). However, the ALJ cannot disregard the medical opinion of a treating physician based solely on his own "amorphous impressions, gleaned from the record and from his evaluation of [the claimant]'s credibility." *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000) (citing *Kent v. Schweiker*, 710 F.2d 110, 115 (3d Cir. 1983)).

In assessing Thomas's credibility, the ALJ found Thomas's statements concerning the intensity, persistence, and limiting effects of his symptoms not credible to the extent that they were inconsistent with the RFC. (D.I. 11 at 26) In her reasoning, the ALJ noted the treatment records from Thomas's physicians did not contain references to the side effects, *i.e.*, dopiness, light-headedness, dizziness, that Thomas noted in his testimony. (*Id.*) Moreover, while Thomas

22

claimed he had balance problems and had fallen six to seven times since the hearing, no treatment records reported this. (*Id.*)

Also, the ALJ noted that Thomas maintains a conservative treatment regimen for his right knee and that each physician recommended he continue with the same low doses of narcotics to control the pain. (*Id.*) At the hearing, the ALJ observed that Thomas could walk normally with a cane, sit and stand normally, and he demonstrated normal memory, attention, and concentration throughout the hearing. (*Id.*) The record is consistent that his pain has been and is controlled by continuous medical treatment and low doses of pain medication. (*Id.* at 26-27) The ALJ's conclusion regarding Thomas' credibility is therefore supported by substantial evidence.

### iii. The ALJ's failure to address a witness statement and occupational medicine specialist

The ALJ did not commit reversible error by failing to address a witness statement by Dr. Fox, Thomas's pharmacist. Thomas cites *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 122 (3d Cir. 2000), to support his assertion that the ALJ had to consider the written note of Dr. Fox. (D.I. 16 at 30-31) However, *Burnett* is distinguishable because the claimant witnesses in that proceeding submitted testimony attesting to the limitations that they observed the claimant experienced. *Burnett*, 220 F.3d at 117. In contrast, Dr. Fox's letter did not identify impairments or health problems and did not mention or describe any functional limitations that Thomas may have experienced. (Tr. at 132)

Moreover, the ALJ was not required to make reference to Dr. Rodgers' examination report. While the ALJ must consider and evaluate the entire record, the ALJ is not expected to make reference to every relevant treatment note in a case that has voluminous medical records. *Fargnoli*, 247 F.3d at 42. Dr. Rodgers was hired to give an opinion, based on Thomas' medical history and an accompanying physical examination, as to what percentage of permanent

23

impairment of Thomas' lower right extremity was related to his work injury in 1993. (*Id.* at 474) The report confirms that Thomas experienced a work-related injury, subsequently underwent surgery, and suffered resulting damage to his knees, but it does not provide new or additional evidence for consideration in the ALJ's RFC determination. (*Id.*) The ALJ did not reject any findings within the report which would require further discussion by the ALJ. *See Fargnoli*, 247 F.3d at 42; *Burnett*, 220 F.3d at 122.

### iv. The ALJ's finding that Thomas could perform simple unskilled light work with a sit/stand requirement is not supported by substantial evidence

The ALJ must consider all relevant evidence when determining an individual's residual functional capacity. *Fargnoli*, 247 F. 3d at 41; 20 C.F.R. §§ 404.1527(e)(2), 404.1545(a), 404.1546. After considering the entire record, the ALJ must accurately convey to the vocational expert all of a claimant's credibly established limitations. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005). If the ALJ's hypothetical question adequately conveys all of the claimant's limitation-causing impairments, then the vocational expert's testimony will constitute "substantial evidence" that such work exists. *Ramirez v. Barnhart*, 372 F.3d 546, 552–55 (3d Cir. 2004).

In light of the court's determination regarding the ALJ's failure to properly consider the opinions of Dr. Kim and Dr. Aldridge, *see* § III.C.i, the ALJ must reevaluate the State agency consultants' opinions and the determination that Thomas is capable of performing light work. I recommend that the court remand this matter to the ALJ for further consideration of the State agency consultants' opinions and additional analysis regarding Thomas' RFC.

## IV.  CONCLUSION

For the foregoing reasons, I recommend that the court grant-in-part Thomas' motion for summary judgment (D.I. 16), deny the Commissioner's motion for summary judgment (D.I. 20), and remand the matter for further administrative proceedings.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in this district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cr. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006). The objections and responses to the objections are limited to ten (10) pages each.

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: December 4, 2014

Sherry R. Fallon
United States Magistrate Judge